**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| Shameka Green, | ) Civil Action No. 3:15-cv-02581-JMC |
| ) | |
| Plaintiff, | ) |
| v. | ) |
| ) | |
| The Bradley Company[1] and HMU, LLC,[2] | ) **ORDER AND OPINION** |
| ) | |
| Defendants. | ) |
| _____ | ) |
| The Bradley Company, | ) |
| ) | |
| Third-Party Plaintiff, | ) |
| v. | ) |
| ) | |
| Hignite Enterprises, LLC, | ) |
| ) | |
| Third-Party Defendant. | ) |
| _____ | ) |

Plaintiff Shameka Green ("Plaintiff" or "Green") filed the instant warranty/products liability action against Defendants D.J. Bradley Company, Inc. d/b/a The Bradley Company ("TBC" or "Bradley") and Open Plan Systems, LLC f/k/a HMU, LLC ("OPS" or "HMU") (together "Defendants") seeking damages as a result of injuries she sustained when a desk collapsed on her while working for Teleperformance Group, Inc. ("TGI").[3] (ECF No. 1-1 at 3 ¶ 9.)

---

[1] The Bradley Company asserts that it has been incorrectly identified and should be referred to as D.J. Bradley Company, Inc. d/b/a The Bradley Company. (ECF No. 74 at 1.) Therefore, the court **ORDERS** the Clerk to change the caption in the docket to reflect this Defendant as D.J. Bradley Company, Inc. d/b/a The Bradley Company.
[2] HMU, LLC asserts that it has been incorrectly identified and should be referred to as Open Plan Systems, LLC f/k/a HMU, LLC. (ECF No. 75 at 1.) Therefore, the court **ORDERS** the Clerk to change the caption in the docket to reflect this Defendant as Open Plan Systems, LLC f/k/a HMU, LLC.
[3] TGI "provides call center services to United States-based companies in various industries." Bloomberg, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=62064642

This matter is before the court by way of OPS's Motion for Exclusion of Plaintiff's Expert based on the applicable Federal Rules of Evidence and Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 75.) Plaintiff opposes both Motions asserting that they should be denied. (ECF No. 97 at 11.) For the reasons set forth below, the court **GRANTS** OPS's Motion for Exclusion of Plaintiff's Expert and **GRANTS** OPS's Motion for Summary Judgment.

## I. JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) based on OPS's allegations that the action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of costs and interest. (ECF No. 1 at 1 ¶ 2–2 ¶ 3.)

## II. RELEVANT BACKGROUND TO THE PENDING MOTION

OPS sold TBC remanufactured systems furniture stations for office installation. (ECF No. 76-2 at 24:21–25:11.) In January and February of 2009,[4] OPS shipped parts to build systems furniture stations to TGI's facility located at 300 St. Andrews Road, Columbia, South Carolina 29210. (Id. at 27:19–30:18; see also ECF No. 76-3 at 3–8.) After the furniture stations were assembled and installed by Third-Party Defendant Hignite Enterprises, LLC[5] ("HEL") at the St. Andrews Road facility, TGI experienced problems with the top of the desk assembly "coming up off of the cantilevers." (ECF No. 76-2 at 39:8–40:10.) During the weekend of June 29, 2009, HEL examined the furniture stations at TGI's St. Andrews Road facility and tried to address the

---

(last visited Aug. 30, 2017).
[4] The information regarding events occurring in 2009 was taken from e-mails sent in that year. (See ECF No. 76-4 at 1–5.)
[5] The court observes that HEL became a party to this action via a Third Party Complaint filed by TBC on September 17, 2015. (ECF No. 15.) TBC and HEL resolved their dispute on or about August 30, 2017. (See ECF Nos. 108, 110.)

problem of "worksurfaces coming displaced" by drilling 2 screws into them. (ECF No. 76-4 at 3.) In October of 2009, TGI was still complaining to OPS about problems with the furniture stations. (Id. at 1–2.) On November 12, 2009, OPS inspected the worksurface of every furniture station and made corrections to 25 stations by replacing cantilevers. (Id. at 1.) OPS believed the problem to be related to paint that was placed on the cantilevers during the remanufacturing process. (ECF No. 76-2 at 53:7–56:15.) On November 24, 2009, TGI notified OPS that 3 more worksurfaces had detached. (ECF No. 76-4 at 4.)

On or about September 23, 2011, Plaintiff was employed by TGI at its St. Andrews Road facility. (ECF No. 97-7 at 1.) On that date, Plaintiff suffered injuries while sitting at her furniture station when the worksurface collapsed onto her legs. (Id.) On June 3, 2014, Plaintiff filed a warranty/products liability action against Defendants Herman Miller, Inc. and TBC in the Court of Common Pleas for Richland County, South Carolina. (ECF Nos. 12 at 1–2 & 75-1 at 2.) On May 15, 2015, Plaintiff filed an Amended Complaint wherein she replaced Herman Miller, Inc. with OPS and asserted claims against Defendants for (1) negligence, (2) breach of the implied warranty of merchantability under S.C. Code Ann. § 36-2-314 (2015), and (3) breach of the implied warranty of fitness for a particular purpose under S.C. Code Ann. § 36-2-315 (2015). (ECF No. 1-1 at 3 ¶ 9–6 ¶ 15.) In support of her causes of action, Plaintiff alleges that Defendants failed to (1) "properly refurbish, repaint and reconstruct the desk in question"; (2) "properly assemble, install and set-up and support the desk in question"; (3) "monitor, maintain or otherwise take reasonable measures to assure the integrity and stability of the desk in question"; and (4) "adhere to applicable standards, guidelines, and regulations for the construction, transportation, installation, assembly, marketing and maintenance of the desk in question." (Id. at 4 ¶¶ 11a–11d.)

On June 26, 2015, OPS removed the matter to this court (see ECF No. 1) and then moved to dismiss the action (ECF No. 4) on July 2, 2015, which Motion was granted by the court on reconsideration as to the negligence cause of action on July 7, 2016. (ECF No. 51.) OPS next moved for summary judgment on September 12, 2016, and TBC moved for summary judgment on September 29, 2016. (ECF Nos. 54 & 56.) On November 14, 2016, the court denied Defendants' Motions for Summary Judgment without prejudice in the following Text Order:

> In their Motions, Defendants first move to exclude the testimony of Plaintiff's expert, Bryan Durig ("Durig") of Summit Engineering, on the basis that "it fails to meet the requirements of Rules 702, 703, 402, and/or 403 of the Federal Rules of Evidence." (ECF No. 54-1 at 9.) If the court agrees with Defendants, they argue that they are entitled to summary judgment because "Plaintiff cannot establish the desk was in a defective condition" or "determine the cause of the desk collapse." (Id. at 10.) Plaintiff opposes Defendants' Motions arguing that they are "patently premature at best and likely to become completely unwarranted when further evidence is developed." (ECF Nos. 55 at 2, 58-1 at 2.) Upon review, the court observes that the premise of Defendants' Motions is that because neither the desk at issue nor an exact replica are available for Durig to inspect, Plaintiff's expert cannot demonstrate "the desk in question was defective, much less, that OPS caused a defective condition to exist or sold the desk in a defective condition and/or any that [sic] defect in the desk caused Plaintiff's injuries." (ECF No. 54-1 at [3].) In considering Defendants' position, the court acknowledges its awareness of a principal found in the Restatement (Third) of Torts: Products Liability that applies where a product was destroyed thus prohibiting an expert from conducting the necessary testing to determine causation. Specifically, the indeterminate product defect test allows "the fact finder to draw an inference that a product is defective where the incident that harmed the plaintiff was (1) of a kind that ordinarily occurs as a result of a product defect; and (2) was not, in the particular case, solely the result of causes other than a product defect existing at the time of sale or distribution." Franklin Mut. Ins. Co. v. Broan-Nutone, LLC, Civil No. 10-04845(NLH)(JS), 2014 WL 2920622, at *5 (D.N.J. June 27, 2014) (citing Restatement (Third) of Torts: Products Liability § 3 (Am. Law Inst. 1997)). Although the South Carolina Legislature has not definitively adopted the Restatement (Third) of Torts: Products Liability, this court has previously observed that the South Carolina Supreme Court has embraced the treatise. See Quinton v. Toyota Motor Corp., C/A No. 1:10-cv-02187-JMC, 2013 WL 2470083, at *2 (D.S.C. June 7, 2013). Based on the foregoing, the court is not yet prepared to find that Defendants are entitled to judgment as a matter of law regarding Plaintiff's warranty claims when the deadline for discovery has yet to expire. Accordingly, the court **DENIES WITHOUT PREJUDICE** Defendants' Motions to Exclude and for Summary

Judgment (ECF Nos. 54 & 56).

(ECF No. 62.)

On July 8, 2016, Plaintiff's expert, Bryan Durig ("Durig") of Summit Engineering, LLP, filed his expert report in which he opined as follows about Plaintiff's accident:

> Based on a review of available information, it is concluded, to a reasonable degree of engineering certainty, the desk portion of a workstation collapsed and struck Ms. Green while she was sitting in her office chair at the subject workstation. Limited discovery has occurred to date. However, there have been a few emails reviewed from 2009 that indicate there were problems with installing cantilevers (support brackets) at the Teleperformance facility in Columbia, South Carolina. One email mentions needed a hammer to knock the support brackets in the slotted channel. Another email stated one option to fix the cantilevers was to "shoot screws in the top of the slotted channel abode [sic] the cantilevers." Shooting screws into the rear wall to support the cantilevers is an improper method of attaching screws and they will pullout over time, especially if forces are applied in a fashion to create a pullout force against the improperly inserted screws. In this case, weight on the desk portion will place a pullout force on the screws, eventually causing them to fail and the desk to collapse. Additional discovery material and deposition testimony will need to be received and reviewed to continue to evaluate additional potential failure mechanisms, in addition to the improperly installed screws, that could have contributed and/or caused the desk portion collapse that injured Ms. Green.

(ECF No. 52-1 at 5–6.) Durig did not supplement his expert report with any additional information. On May 5, 2017, OPS filed Motions for Exclusion of Plaintiff's Proposed Expert and for Summary Judgment.[6] (ECF No. 75.) After the parties responded and replied to the Motion (ECF Nos. 97 & 102), the court heard argument from the parties at a motion hearing on August 31, 2017. (ECF No. 112.)

### III. LEGAL STANDARD

A. <u>Summary Judgment Generally</u>

Summary judgment should be granted "if the movant shows that there is no genuine

---

[6] The court observes that on May 4, 2017, TBC also moved for summary judgment. (See ECF No. 74.) Plaintiff and TBC resolved their dispute on or about August 30, 2017. (See ECF No. 108.)

5

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson, 477 U.S. at 252; Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

B.  Expert Testimony

The admissibility of expert witness testimony is specifically governed by Federal Rule of Evidence 702, which provides that an expert may offer their opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

6

Id. In determining whether expert witness testimony is admissible, the court evaluates whether it is reliable first and then whether it is relevant. Daubert v. Merrell Dow. Pharm., Inc., 509 U.S. 579, 589 (1993); see also Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999). In making an assessment of reliability, courts, acting as a "gatekeeper" in determining the admissibility of expert testimony, may consider a number of factors, including: (1) whether a theory or technique can and has been tested; (2) whether a theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, in conjunction with the existence and maintenance of standards controlling the technique's operation; and (4) whether there is "general acceptance" of the theory or technique within the relevant scientific community.[7] Daubert, 509 U.S. at 589, 592–595. But Daubert's list of factors is "meant to be helpful, not definitive" and "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999). In determining the relevance component of admissibility, the court must ascertain "whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute." Wickersham v. Ford Motor Co., Nos. 9:13-cv-1192-DCN, 9:14-cv-0459-DCN, 2016 WL 5349093, at *2 (D.S.C. Sept. 26, 2016) (citing Daubert, 509 U.S. at 593); see also Westberry, 178 F.3d at 260. The United States Court of Appeals for the Fourth Circuit has stated that "the touchstone of admissibility is whether the testimony will assist the trier of fact." Wehling v. Sandoz Pharmaceuticals Corp., 162 F.3d 1158, 1998 WL 546097, at *3 (4th Cir. 1998) (table decision).

The Fourth Circuit has also identified two guiding principles for courts' decisions on the

---

[7] Additionally, as to relevance, Rule 403 of the Federal Rules of Evidence permits exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

admissibility of expert witness testimony. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). First, "court[s] should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence" and second "court[s] must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." Id. Regardless, "the proponent of the [expert] testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

## IV. ANALYSIS

A. The Parties' Arguments

OPS first moves to exclude Durig's testimony on the basis that "it fails to meet the requirements of Rules 702, 703, 402, and/or 403 of the Federal Rules of Evidence." (ECF No. 75 at 1.) OPS argues that Durig's opinions are not admissible because they "(a) will not help the trier of fact to understand the evidence or determine a fact in issue in this case; (b) are not based on sufficient facts or data; (c) are not the product of reliable principles and methods; and (d) Mr. Durig has not reliably applied any principles or methods to the facts of this case." (ECF No. 75-1 at 10.) OPS further argues that "[i]n arriving at his conclusions, Mr. Durig relies upon information contained within emails pertaining to the desks from two years before the alleged incident of Ms. Green." (Id. at 11 (referencing ECF No. 52-1).) Moreover, if the court agrees that Mr. Durig's testimony should be excluded, OPS argues that it is entitled to summary judgment because "Plaintiff cannot [either] establish the desk was in a defective condition" or "determine the cause of the desk collapse." (Id. at 10–11.)

Additionally, OPS argues that the court should avoid applying the Indeterminate Product Defect Test referenced in its November 14, 2016 Text Order because the test has not been adopted in South Carolina and the State has failed to embrace the similar principle of res ipsa

loquitur. (ECF No. 75-1 at 16 (citing Snow v. City of Columbia, 409 S.E.2d 797 (S.C. Ct. App. 1991)).) OPS further argues that even if the Indeterminate Product Defect Test was applicable, OPS is entitled to summary judgment because Plaintiff's evidence fails to rule out other causes for the failure of the furniture station such as "heavy usage, manipulation, misuse and wear and tear of the desk from the time OPS provided the desks." (Id. at 18.)

Plaintiff argues that the court should deny OPS's Motion for Summary Judgment because her evidence in the form of the 2009 e-mails and deposition testimony from Hugh Hutcherson, OPS's former field manager, demonstrates "specific problems with the desk systems in question and specifically attribut[es] the problems to conditions fomented by representatives and agents of Open Plan Systems." (ECF No. 97 at 1–2.) Moreover, even though she lacks evidence regarding the specific furniture station in question, Plaintiff argues that "the Malfunction Theory Doctrine applies in this case" and allows her to not have to "establish that a specific defect caused an accident if circumstantial evidence permits an inference that the product in one way or another probably was defective." (ECF No. 97 at 8 (citing David G. Owen, Manufacturing Defects, 53 South Carolina Law Review 851 (2002)).) In support of these arguments, Plaintiff asserts as follows:

> Plaintiff has evidence which tends to establish that the desk in question was one of the desks transferred from the Defendant HMU - which had repainted the cantilever mechanisms in question without removing the former paint - to The Bradley Company which in turn transferred the desk systems to Teleperformance, Inc., and had them installed by the Third Party Defendant Hignite Enterprises. The continuum of occurrences of problems of falling desks as specifically elucidated in the emails in 2009 and which according to Plaintiff's additional witnesses continued through 2011 constitute evidence from which a jury may infer culpability under the above cited evidentiary standards and ordinary requirements of breach of warranty claims.

(Id. at 10.)

B. The Court's Review

The claims at issue in this action are for breach of the implied warranty of merchantability[8] under S.C. Code Ann. § 36-2-314 (2015) and breach of the implied warranty of fitness for a particular purpose[9] under S.C. Code Ann. § 36-2-315 (2015). In an action based on these implied warranties, Plaintiff must demonstrate that the product was in a defective condition unreasonably dangerous to the user when it left the control of the defendant, and the defect caused his injuries. E.g., Brunson v. La.-Pac. Corp., 266 F.R.D. 112, 119 (D.S.C. 2010) ("To recover for breach of the implied warranty of merchantability, a plaintiff must prove (1) a merchant sold goods; (2) the goods were not 'merchantable' at the time of sale; (3) the plaintiff or his property were injured by such goods; (4) the defect or other condition amounting to a breach of the implied warranty of merchantability proximately caused the injury; and (5) the plaintiff so injured gave timely notice to the seller.") (citation omitted); Thomas v. La.-Pac. Corp., 246 F.R.D. 505, 511 (D.S.C. 2007) ("[A]n implied warranty of fitness for a particular purpose arises if the vendor knows when the contract is formed that the purchaser is relying on the vendor's skill or judgment in furnishing the goods.") (citations omitted); Morris v. Kmart Corp., No. 2:09-cv-03267-DCN, 2012 WL 1067642, at *2 (D.S.C. Mar. 29, 2012) ("Under South Carolina law, a 'products liability case may be brought under several theories, including . . . warranty.' Regardless of the particular theory, a plaintiff must establish: '(1) that he was injured

---

[8] "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." S.C. Code Ann. § 36–2–314(1) (2013). South Carolina law sets forth several requirements that must be met for goods to be merchantable. See id. at § 36–2–314(2). For purposes of Plaintiffs' claim, the only requirement relevant is that the goods, to be merchantable, "are fit for the ordinary purposes for which such goods are used." Id.

[9] In South Carolina, an implied warranty of fitness for a particular purpose arises if "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . ." S.C. Code Ann. § 36–2–315 (2013).

10

by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user.'") (internal and external citations omitted); Soaper v. Hope Indus., 424 S.E.2d 493, 495 (S.C. 1992) (holding that plaintiff, who purchased film processing machine, "impliedly made known to [defendant] that his particular purpose for the machine was fast film processing" and that "[w]hen the machine failed in that purpose, it was both unmerchantable and unfit for its particular purpose"). Defect claims require competent expert testimony to establish proximate cause. Disher v. Synthes (U.S.A.), 371 F. Supp. 2d 764, 772 (D.S.C. 2005) (applying South Carolina law); see also Babb v. Lee Cty. Landfill SC, LLC, 747 S.E.2d 468, 481 (S.C. 2013) ("The general rule in South Carolina is that where a subject is beyond the common knowledge of the jury, expert testimony is required.") (citation omitted). In its Motions, OPS argues that neither Plaintiff's expert, Durig, nor Malfunction Theory, allow Plaintiff to demonstrate the allegedly defective condition of the furniture station sold by OPS.

Upon consideration, the court observes that Malfunction Theory is not available to Plaintiff because the theory acts as an impermissible state law limitation on the expert qualification requirements established by Daubert and the Federal Rules of Evidence. See Bryte v. Am. Household, Inc., 429 F.3d 469, 475–76 (4th Cir. 2005) (affirming the district court's decision to exclude causation testimony relying on the Malfunction Theory). In Bryte, plaintiffs-appellants argued that their expert "need not review product remains" and could rely on Malfunction Theory and circumstantial evidence "to arrive at an opinion as to the probable defect" because "evidence as to causation is not controlled by Daubert and the Federal Rules of Evidence." Id. at 475. The Fourth Circuit observed that the argument by the Bryte plaintiff-

appellants (and Plaintiff in this matter) is in essence that state law supersedes "the Federal Rules of Evidence, where, as here, products-liability claims, destruction of physical evidence, causation, and expert testimony converge." Id. In rejecting that argument, the Fourth Circuit reaffirmed that "the admissibility of expert testimony in federal court sitting in the diversity jurisdiction is controlled by federal law [][and] State law, whatever it may be, is irrelevant." Id. at 476; see also Cavallo v. Star Enter., 100 F.3d 1150, 1157 (4th Cir. 1996).[10]

In light of the foregoing, the court must evaluate Durig's testimony by the factors outlined in Rule 702 and Daubert. Initially, the court observes that Durig appears qualified to offer opinion testimony in this matter based on his approximately 29 years of experience as an engineer, the last 20 of which he has spent conducting fall investigations. (ECF Nos. 52-1 at 3 & 52-2 at 1.) Moreover, Durig's educational background includes a Master of Business Administration, a Doctor of Philosophy in Mechanical Engineering, a Master of Science in Mechanical Engineering, and a Bachelor of Science in Mechanical Engineering, all from the University of South Carolina. (ECF No. 52-2 at 1.) In addition, Durig has authored numerous publications, maintained his knowledge through continuing education courses, and testified as an expert in various court cases. (Id. at 3–7; see also ECF No. 52-3 at 1–33.)

However, in light of the foregoing experience and education, Durig's report does not explain the methodology undergirding his opinion(s) and the only theory he definitively offers is that Plaintiff's injuries occurred as a result of the furniture station's worksurface.[11] (See ECF

---

[10] Because of the inherent similarities in the principles, the court presumes that the Fourth Circuit's ruling would also apply to the Indeterminate Product Defect Test referenced in its November 14, 2016 Text Order. All of the cases cited by Plaintiff in support of Malfunction Theory and the Indeterminate Product Defect Test predate the Fourth Circuit's ruling in Bryte. (See ECF No. 97 at 8–10.)
[11] The court observes that only Durig's expert's report was presented for review. The information before the court is that the parties did not depose Durig.

No. 52-1 at 5 ("Based on a review of available information, it is concluded, to a reasonable degree of engineering certainty, the desk portion of a workstation collapsed and struck Ms. Green while she was sitting in her office chair at the subject workstation.").) Further, Durig only offers speculative possibilities as to what caused the desk portion of the furniture station to collapse. (See ECF No. 52-1 at 5 ("One possible cause to the desk portion collapsing on Ms. Green would be the improper attachment method of shooting screws into the rear wall by HMU employees to attach the support brackets (cantilevers).") & 6 ("Additional discovery material and deposition testimony will need to be received and reviewed to continue to evaluate additional potential failure mechanisms, in addition to the improperly installed screws, that could have contributed and/or caused the desk portion collapse that injured Ms. Green.").[12]) Durig's perceived indecisiveness is the result of his being able to only review the Complaint (ECF No. 1-1), Plaintiff's Workers' Compensation Deposition, Plaintiff's S.C. Workers' Compensation Commission Hearing, a current Teleperformance facility inspection, e-mails between Defendants (ECF No. 55-1 at 6–9), an e-mail to Hignite Enterprises (id. at 1), and a discussion with Plaintiff. (ECF No. 52-1 at 3.) In this regard, Durig not only admits in his report that he could not

---

[12] In addition, Durig submitted an affidavit in which he acknowledged another possible cause:

> I have become aware of additional information regarding the subject workstation and the location of exemplar workstations. Reportedly, paint was used to repaint portions of the workstations without removing the old paint layers from the existing workstation components. Adding layers of paint without removal of the existing paint will decrease the ability of inert wooden or metal parts inside recessed/slotted areas (the inserted piece becomes too thick to fit inside the slot) which can allow the part to be improperly supported. An improperly supported part can fail at a lower load than the designed load due to the supported piece not being in full contact with the inserted piece. Higher stresses will be present since less surface area is in contact between each part. Multiple layers of paint can change the design conditions and loading conditions of the workstation and lead to a failure at a lower loading condition compared to the original design.

(ECF No. 97-9 at 2 ¶ 4.)

examine either the subject workstation or an exemplar, but it is pretty apparent that he expected to receive additional information and the lack thereof impeded his ability to test his theories as to what caused the desk portion of the furniture station to collapse. (See ECF No. 52-1 at 3.[13])

Upon review of the foregoing, the court finds that Plaintiff has not met her burden of demonstrating the admissibility of Durig's testimony. In support of this finding, the court observes that even though strict application of the Daubert factors is not expected in the context of engineering testimony, see Kumho Tire, 526 U.S. at 150, it is very difficult to conclude that any Daubert factor is satisfied in this circumstance much less analyze what principles and/or methodology Durig used. As a result, the court does not find Durig's testimony to be sufficiently reliable to satisfy the requirements of either Rule 702 or Daubert and therefore should be excluded. Young v. Swiney, 23 F. Supp. 3d 596, 611 (D. Md. 2014) ("However, to be admissible, the expert testimony need not be irrefutable or certainly correct. Rather, the proponent must show that it is reliable.") (citations and quotation marks omitted); Fernandez v. Spar Tek Indus., Inc., C.A. No. 0:06-3253-CMC, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008) ("It follows that an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert."). Accordingly, OPS's Motion to Exclude Durig should be granted.[14]

Absent the now-excluded testimony of Durig, Plaintiff is unable to establish either the existence of a defect in the furniture station at issue, or that a defect was the proximate cause of

---

[13] "I expect to review discovery material when it is produced by defendants." (ECF No. 52-1 at 3.) "I also expect to review depositions when they are taken and provided to Summit Engineering, LLP." (Id.) I will provide a supplemental report when the additional discovery is provided." (Id.) The court observes that a supplemental report was never provided.

[14] The court observes that Plaintiff's counsel suggests that TGI has attempted to obstruct his efforts to prosecute the case on Plaintiff's behalf. (See ECF No. 97 at 5–6.) There do not appear to have been any requests made of the court to either aid Plaintiff in her attempts to procure discovery from TGI or respond to issues regarding spoliation of evidence.

her injury—both essential elements of her claim. Accordingly, OPS is entitled to summary judgment on Plaintiff's claims for breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose.

## V. CONCLUSION

For the reasons set forth above, the court **GRANTS** OPS's Motion for Exclusion of Plaintiff's Expert and **GRANTS** OPS's Motion for Summary Judgment.[15] (ECF No. 75.)

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

September 12, 2017
Columbia, South Carolina

---

[15] In light of the court's decision, OPS's pending Motion in Limine is **DENIED AS MOOT**. (ECF No. 79.)

15